## Illinois Central Railroad Company v. Anderson.

(Decided December 18, 1923.)

### Appeal from McCracken Circuit Court.

1. False Imprisonment—Finding Defendant Procured Arrest Against Weight of Evidence.—In an action against a railroad for false arrest procured by defendant's detectives, actual arrest being made by city police, a finding that defendant's agents procured the arrest held flagrantly against the weight of evidence.

2. False Imprisonment—$2,500.00 Damages Held Excessive.—A verdict for $2,500.00 for false arrest and consequent spending of night in jail upon a hard bench held so great as to impress one at first blush as being and brought about through passion and prejudice.

WHEELER & HUGHES for appellant.

C. C. GRASSHAM, L. B. ALEXANDER and REED & BURNS for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE SAMPSON—
Reversing.

The judgment of the McCracken circuit court from which this appeal is prosecuted awarded appellee, Emma Anderson, $2,500.00 in damages against appellant, Illinois Central Railroad Company, for alleged false arrest averred to have been procured and brought about by the agents and servants of appellant railroad company while acting for and on behalf of that company. Ira Anderson, for whom the railroad company had procured a warrant of arrest for wrecking a passenger train near the city of Paducah, accomplished by taking the spikes and bolts out of the rails and allowing the engine to turn over, was the husband of appellee. At that time the Andersons resided in Paducah, but they soon left there, and their place of abode was unknown for some time until detectives of the railroad company located them at a certain street address in St. Louis. With a warrant for the arrest of Ira Anderson, one or more of the detectives of the railroad company went to St. Louis and called upon the captain of police for the third district of that city and presented the warrant and asked that the police officers arrest Ira Anderson; after making some inquiry the captain of police, who had theretofore received complaints against the house where the Andersons lived, directed some of his subordinates, members of the police force, to raid the place and arrest the inmates. Accordingly, on the following morning about four o'clock several policemen in charge of Sergeant Carroll, accompanied by two detectives for the railroad company, went to the street number where the Andersons resided and knocked for admittance. Appellee, Mrs. Anderson, raised a window and called out to know who was there, and being told, and also observing that there was quite a crowd, she sent Hutson, the only roomer in the house, down to open the door. When he came to the door the officer asked him if Anderson lived there and if he were home. Being informed that he was, the police officers went upstairs. The apartment was over a grocery store; when they went into the room Anderson was in bed, but appellee, his wife, was standing in the room only partly dressed. The police officers did not know Anderson, but they inquired of him if his name was Anderson and received an affirmative answer. At that time the detectives for the railroad company were

outside on the street. In order to know whether or not Anderson was the man they wanted, one of the police officers called out of the window and asked if there were anyone down there who could identify Anderson, the man named in the warrant, whereupon one of the detectives said he could identify him and the officer then told him to come up in the room. When he arrived at Anderson's room he identified the man in bed as Ira Anderson, the defendant named in the warrant. The police offcer then arrested Anderson and directed him to get up and dress and to go with them. They also arrested his wife and Hutson, being all the persons in the house. The three were carried to the police station of the third district where they were locked up. Appellee, Mrs. Emma Anderson, complains she was locked in the department for the detention of women and was furnished no bed or food. She says she was required to sleep upon a plank or board without mattress or pillow; that she was only furnished some bologna sausage for food, which she says she declined to eat. She also complains that as a result of sleeping upon the boards she was bruised on the hips and back and took cold which caused her to be sick; that she had not at the time of the trial fully recovered from the nervous shock which she sustained as a consequence of her treatment. She was discharged from the prison about three or four o'clock on the afternoon of the next day, whereupon she boarded a train for Paducah, Kentucky, where she sought the services of a physician. He later testified on her behalf concerning her nervous condition at the time, and the bruises upon her person.

There was no warrant of arrest for appellee, Mrs. Anderson, and so far as the record shows there was no charge against her. The only question therefore is, was she arrested at the instance or suggestion of the railroad company or any of its employes, acting in the course of their employment; or was she arrested by the police of the city of St. Louis upon their own initiative?

The appellant company insists (1) that the verdict is not sustained by the evidence; that it is flagrantly against the weight of the evidence; and (2) that the verdict is excessive, appearing to have been given under the influence of passion and prejudice.

The appellee testified in her own behalf that the detectives in the employment of the railroad company were the first to enter the room on the night of her arrest and

that they called her names and insulted her; would not allow her to withdraw from their presence to dress herself before taking her to the police station; that after they went to the police station these detectives of the railroad company annoyed her and continued to speak to her as if she were a woman of bad character, a street walker, and that she was greatly humiliated, and suffered a severe nervous shock from which she had not fully recovered at the time of the trial, several months later.

As stated before, there were quite a number of persons present at the time the arrest was made; several of these persons testified for the railroad company. The captain of the police, whom the detectives first approached to obtain the arrest of Ira Anderson, stated that the detectives said nothing at all about the arrest of Emma Anderson and did not instigate or encourage it or bring it about, but that having a complaint against the house as disorderly the captain of police directed a full investigation of the place should be made, and upon his own initiative and without suggestion from the railroad detectives or other employes of that company, ordered his subordinates to raid the place and to arrest all persons there, including Anderson if he were found. The detectives testfied to the same effect. They say they did not know that Anderson had a wife or that his wife resided with him at that street number; that they did not desire her arrest and did not procure it. The police who went with the detectives on the night of November 3rd, 1921, to make the arrest say that the detective did not go into the house and did not authorize, direct or suggest that anyone in the house be arrested save Ira Anderson; that after the police force had entered the Anderson apartment and had found Anderson but were unable to identify him and called out of the window and asked if there was anyone present who could identify Anderson, one of the railroad detectives answered he could identify him. The police officers thereupon directed the detective to come up in the apartment for the purpose of identifying Anderson, and in obedience to this summons the detective did go into the apartment of Anderson and upon seeing him identified him as the man for whom the warrant was issued. All of them testify that the detective did not suggest that Mrs. Anderson be arrested; that the detectives did not evince any desire to have her arrested and did not speak of or to her, nor

follow her into the room where she was dressing or in any way insult or alarm or intimidate her. Furthermore, the police officers say that they arrested appellee upon their own volition and without direction or suggestion from any person connected with the Illinois Central Railroad Company; that it was their custom in making a raid on a place like the Anderson home against which there had been complaint of disorderly conduct to arrest every person residing in the place and carry them to the police headquarters for investigation, and in pursuance to such rule they did arrest Mrs. Anderson and Hutson and carried them to the police headquarters along with Ira Anderson and there without the assistance or direction of the railroad detectives placed them in the lockup to await further development. Aside from the evidence of appellee to the effect she was insulted and abused by the detectives at the police station, all the other evidence goes to show she was not mistreated either by the police or the detectives but was treated as other persons under arrest were usually treated under like circumstances.

There was a large number of witnesses called to prove the reputation of appellee, Emma Anderson. All of them stated her reputation was bad for lewdness. This reputation was proven from the time of the trial back for several years. She was unable to sustain a good reputation by evidence. Her sister, with whom she (appellee) had recently resided, was shown to be a common prostitute. Moreover, appellee's testimony proceeds upon the assumption that the detectives caused her arrest, and it is full of statements which while given as facts could have been nothing more than suspicions or assumptions on her part.

While perhaps there was enough competent evidence to carry the case to the jury, we think the great weight of the evidence was against appellee; that the verdict is flagrantly against the weight of the evidence. Furthermore, if entitled to recover at all the verdict is excessive, being so great as to impress one at first blush that it was given and brought about through passion or prejudice.

Some other grounds were assigned for a reversal of the judgment which we will not consider for the reason we do not anticipate they will occur upon another trial.

For the reasons indicated the judgment is reversed for proceedings not inconsistent with this opinion.

Judgment reversed.